**IN THE COURT OF APPEALS OF IOWA**

No. 13-1968
Filed March 25, 2015

**STATE OF IOWA,**
          Plaintiff-Appellee,

**vs.**

**RONALD HAWKINSON,**
          Defendant-Appellant.
_____

          Appeal from the Iowa District Court for Polk County, Arthur E. Gamble,

Judge.

          A defendant appeals from his convictions for first-degree murder.

**AFFIRMED.**

          Mark C. Smith, State Appellate Defender, and Robert P. Ranschau,

Assistant Appellate Defender, for appellant.

          Thomas J. Miller, Attorney General, Mary A. Triick, Assistant Attorney

General, John P. Sarcone, County Attorney, and Jeffrey K. Noble, Assistant

County Attorney, for appellee.

          Heard by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**MULLINS, J.**

Ronald James Hawkinson appeals from his conviction on two counts of murder in the first degree. He contends his trial counsel was ineffective in failing to ensure the court complied with Iowa Rule of Criminal Procedure 2.17(1) when he waived jury trial; the court abused its discretion by admitting testimony recounting a conversation in which he stated he would be going back to jail; and the court erred in finding the evidence was sufficient to support convictions for first-degree murder rather than voluntary manslaughter as a result of provocation. We affirm the evidentiary ruling and the conviction and preserve the ineffective-assistance-of-counsel claim for postconviction relief.

## I.     BACKGROUND FACTS & PROCEEDINGS.

Serif "Sam" Hidic was the owner of Drina Trucking, Inc. in Des Moines. Hidic employed the defendant, Hawkinson, as a truck driver and Robert "Bob" Smoot as a dispatcher. Deb Seibert owned Seibert Trucking, which was located on the same property as Drina Trucking. Carol Jaramillo handled paperwork, payroll, and other matters for Drina Trucking.

In 2011, Hawkinson and Hidic entered into an agreement whereby Hidic loaned Hawkinson money for the purchase of a truck, and Hawkinson agreed to use the truck to work for Drina. This agreement led to a financial dispute, and Hidic filed a lawsuit against Hawkinson. After Hawkinson failed to keep up with loan repayments, Hidic demanded Hawkinson turn the truck over to Drina. Hawkinson told his friend, Roger DeGregory, "He would not lose that truck and he would kill that motherfucker [Hidic] before he ever got that truck back."

The district court made the following undisputed findings of fact:

In addition to his financial dispute with Hidic, Hawkinson had personal problems. He went through a bad divorce. Devastated by his marital problems, Hawkinson attempted suicide by trying to asphyxiate himself in a storage shed in Boone, Iowa. A no-contact order entered against Hawkinson in favor of his ex-wife prevented him from seeing his daughter. Hawkinson was behind on child support . . . .

On April 26, 2012, Hidic and Hawkinson settled their lawsuit . . . . Hawkinson agreed to deliver the truck to Hidic. Hidic agreed to pay the April 2012 truck payment and to pay Hawkinson $3,000. Upon payment in full the truck was to be titled in the name of Drina and Hidic.

On the afternoon of May 16, 2012, [a Drina employee] picked up Hawkinson's tractor truck at the Kum & Go at Guthrie Avenue and I-235 in Des Moines. The key was left in the truck . . . .

On May 16, 2012, Carol Jaramillo was supposed to prepare payroll checks for the Drina drivers. Hidic told [Jaramillo] not to do a check for Hawkinson and he would take care of it. Hawkinson came in on May 16th looking for his paycheck, but he was told it was not ready. On May 17, 2012, Hidic told [Jaramillo] that he wanted to fire Hawkinson. Smoot told [Jaramillo], "He did it again." Hidic was upset because Hawkinson did not pick up a load in Chicago. This was the second time Hawkinson failed to pick up an assigned load . . . .

Instead of going to Chicago to pick up that load for Drina, Hawkinson took his truck in another direction and picked up his 20 year old son, Dylan . . . .

Hawkinson was on probation. Hawkinson knew that possession of a firearm would violate the conditions of his probation. His family, friends and coworkers did not know Hawkinson to own, possess or carry firearms prior to May 17, 2012. However, Hawkinson was armed with a .22-caliber semi-automatic rifle with a sawed-off stock on May 17, 2012 . . . .

On the morning of May 17, 2012, Hawkinson returned to Drina. Hawkinson visited Deb Seibert and talked to her for about an hour late that morning. Deb Seibert was aware Hawkinson and Hidic had an ongoing dispute over money. She thought Hawkinson was there to work it out and make things right with Hidic. At times during this conversation Hawkinson was upset, tearful and angry. Hawkinson was distraught because his no-contact order was extended while he was out on the road so that he could not see his daughter. Hawkinson was angry because someone at Drina wanted him to become involved in drug activity with his semi. Hawkinson told Deb Seibert that Hidic had asked him to pick up

packages and when Hawkinson refused Hidic became very angry with him. As a result, Hawkinson was missing out on some loads. Hawkinson was upset about Hidic. Hawkinson had given back the keys to the truck and said that he "was done dealing with Sam [Hidic]." Hawkinson told Deb Seibert that he "was not going to allow that drug-running gangster to take care of him or bully him around."

During this conversation, Hawkinson told Deb Seibert, "I'm going back to prison." Seibert knew Hawkinson was on probation. She was shocked by his statement. Deb Seibert asked, "What did you do?" Hawkinson responded, "I haven't done anything. I wouldn't do anything that wasn't worth going back to prison for" . . . .

. . . .

Deb Seibert left around 1:00 p.m. on May 17, 2012, to go to her daughter's graduation. Hawkinson returned to Winterset [where he lived with his parents, Joan and Tom Winters] to have lunch with his girlfriend, Rhonda Plew, and Dylan at Joan and Tom Winters' house . . . . Hawkinson left in his black pickup with Dylan . . . . Supposedly, Hawkinson and Dylan were going to put in job applications in Des Moines. However, Hawkinson dropped Dylan off somewhere in Winterset. Dylan was seen at a Kum & Go in Winterset that afternoon. Hawkinson traveled to Des Moines alone with the .22-caliber rifle with a sawed-off stock loaded with .22 short bullets and one .22 long or long rifle bullet.[1] Around 5:00 p.m., Joan Winters took Rhonda Plew around Winterset to get job applications. Joan did not know that Dylan was still in Winterset and that Hawkinson had gone to Des Moines alone.

By the time Hawkinson returned to Drina, Deb Seibert, [], Carol Jaramillo, and [other employees] had all left work for the day. Hawkinson arrived at about 5:00 p.m. on May 17, 2012. Only Bob Smoot and Sam Hidic remained on the property. The evidence clearly establishes that Hawkinson shot Smoot and Hidic, but the order of the shooting cannot be conclusively determined. However, based on the physical evidence at the crime scene, the Court reasonably infers that Hawkinson approached Smoot in the foyer area of the office shed and shot him several times. Hawkinson then shot Hidic in front of the service door on the west side of the Morton Building. Hidic went down on his chest in a pool of blood on the doormat outside the Morton building. At this point, neither

---

[1] Hawkinson takes issue with the district court's finding that he was armed as he traveled to Des Moines. We agree that the record is unclear as to the source of the gun and when Hawkinson acquired it. Nonetheless, he was not known to have owned a gun prior to this incident and obviously acquired it at some point. Our analysis of the legal issues is not affected by this factual uncertainty.

victim was mortally wounded. Both victims could have survived these injuries with prompt medical attention. Hawkinson turned his attention to Smoot in the office shed. Smoot had moved from the foyer in the back office in the shed. As Smoot was calling 911 on the office landline, Hawkinson shot him again including two shots to the back. This shooting is recorded on the 911 call placed by Bob Smoot to the Des Moines Police Dispatch at 5:02 p.m. on May 17, 2012. On the recording of this 911 call, Smoot screams, "No, Ronnie! Ronnie, no! Ronnie, no! No, Ronnie!" Smoot fell to the floor of the office as Hawkinson shot four times. After the fourth shot, 27 seconds elapsed on the 911 recording. Then four more shots are recorded on the 911 call as Hawkinson shot Hidic on the gravel walkway between the Morton building and the northeast corner of the office shed. Hidic died at the north end of the walkway.

    Not all of the shots were recorded on the 911 call. Hawkinson shot each victim seven times. The autopsy revealed all of the shots were to the face, head and chest of the victims. Police recovered a total of fourteen .22-caliber short shell cases with a "U" head stamp and one .22-caliber long or long rifle shell casing with a "C" head stamp at the scene. Police also recovered a live .22-caliber short round with a "U" head stamp from the washing machine and trash bag from Joan Winter's house [in Winterset].

    . . . .

    By the time police arrived, Hawkinson had fled the scene in his black pickup truck. Hawkinson's U.S. Cellular phone records show where he went as his cell phone pinged off of towers on May 17, 2012, between 5:08 p.m. and 7:34 p.m. Hawkinson exchanged cell phone calls with his mother, Joan Winters, and his girlfriend, Rhonda Plew, after the shooting. From Hawkinson's U.S. Cellular phone records, it appears Hawkinson fled north away from the scene on S.E. 14th Street, then west on I-235, and back south on Fleur Drive or S.W. 9th Street toward Indianola and Winterset.

    As Joan Winters was taking Rhonda Plew around Winterset to get job applications, she got a call from Hawkinson. He said he was low on gas and asked her to meet him and pick him up. Hawkinson told his mother that he loved her. Hawkinson sounded depressed and suicidal . . . . he said he didn't want to talk about it right then. Joan Winters called her husband. He called Hawkinson back and said she was on her way. Hawkinson told her to meet him on the other side of Martensdale. Joan asked Hawkinson what was wrong and he again replied that he didn't want to talk about it.

    Joan Winters drove east in her Chevrolet Tahoe on Highway 92 with Rhonda Plew. During this time, Joan and Rhonda exchanged cell phone calls with Hawkinson. Joan travelled through Martensdale and took a right on a road south of Hwy. 92 where she

met Hawkinson in his black pickup. Rhonda Plew got out of Joan's Tahoe and got in Hawkinson's truck. Hawkinson got in Joan's Tahoe carrying what looked like a gun wrapped in a shirt with a wooden piece sticking out. It was bigger than a handgun. Hawkinson was emotional. He said he shot someone or someone got shot. He said, "Let's get the hell out of here." Joan started driving back north on Hwy. 92 . . . . As Joan headed back west on Hwy. 92 toward Winterset, Hawkinson said, "I need to get rid of this." Joan assumed he meant the gun. Joan turned south on Bevington Park Road and stopped on a bridge over the [Middle][2] River. Hawkinson got out of the Tahoe and threw the gun in the river. He came back to the Tahoe with his shirt.

Joan then took Hawkinson to her home [in Winterset]. As they pulled up to the house, Rhonda was getting out of Hawkinson's black pickup and going through the driver's side. Hawkinson put on his shirt and went in the house. He took off his black boots and placed them on a rack in the mudroom. Hawkinson took off his shirt and jeans and put them in a washer with a load of Dylan's clothes. Hawkinson went to get cleaned up. Joan put the clothes through a wash cycle. Hawkinson came up to Tom Winters in the yard and said, "Well, Dad, I shot somebody today" . . . .

When Deb Seibert came out from her daughter's graduation, she noticed missed calls and text messages on her phone about a shooting at the property of her trucking company. She called the police and met detectives at her office about 6:00 p.m. Deb Seibert told the detectives that Hawkinson had a dispute with Hidic and that earlier in the morning of May 17, 2012, Hawkinson had stated to her that he was going back to prison and he wouldn't do anything that was not worth going back to prison for. She told police that Hawkinson was on probation. She provided police with Hawkinson's . . . phone number and address in Winterset.

(Internal citations to record omitted.) Police and investigators later recovered Hawkinson's clothing and boots from the day as well as one more bullet casing, stamped with a "U," from the washer. A small blood stain was found on the inside of a boot showing DNA from at least two people, but individual DNA

---

[2] In a post-trial motion, the State asked the court to amend its findings to reflect the river into which Hawkinson threw the gun was the Middle River, not the North River. The court granted this motion and amended its findings of fact, conclusions of law, and verdict accordingly.

profiles could not be obtained. A blood stain from the sole of a boot matched the DNA profile for Hidic. Joan Winters showed officers the area of the river where Hawkinson had thrown the gun. A forensic dive teamed recovered a .22-caliber semi-automatic rifle with a sawed-off stock. The district court explained:

> [A DCI criminalist] examined the weapon and found it to be a Sport King .22-caliber semi-automatic rifle that was chambered for both .22-caliber short and .22-calibert long and long rifle bullets. The magazine had the capacity to hold up to fourteen .22-caliber short and one .22-caliber long or long rifle bullets. The spent shell casings recovered at the crime scene and slugs recovered at autopsy have the same class characteristics as the weapon recovered from the river, but due to rust there are not enough individual characteristics to conclude this rifle fired these bullets . . . The fact this weapon could fire both .22-caliber short and .22-caliber long and long rifle ammunition is uncommon and narrows the field of possible murder weapons.

The State charged Hawkinson with two counts of murder in the first degree, pursuant to Iowa Code sections 707.1 and .2 (2011). Hawkinson waived jury trial and the case was tried to the bench. The court found Hawkinson guilty of two counts of first-degree murder. Hawkinson appeals, contending his trial counsel was ineffective in failing to ensure the court complied with Iowa Rule of Criminal Procedure 2.17(1) when he waived jury trial; the court abused its discretion by admitting Seibert's testimony recounting her conversation with him about going back to jail; and the court erred in finding the evidence was sufficient to support a conviction for first-degree murder rather than voluntary manslaughter as a result of provocation.

## II.    ANALYSIS.

### A.    Ineffective Assistance of Counsel—Waiver of Jury Trial.

Hawkinson contends his counsel was ineffective in failing to object when the court failed to obtain his waiver of jury trial in writing, as required under Iowa Rule of Criminal Procedure 2.17(1).  "Ordinarily, we do not decide ineffective-assistance-of-counsel claims on direct appeal."  *State v. Tate*, 710 N.W.2d 237, 240 (Iowa 2006).  "We prefer to reserve such questions for postconviction proceedings so the defendant's trial counsel can defend against the charge."  *Id.* We depart from this rule when the record is adequate to evaluate the appellant's claim.  *Id.*

We review ineffective-assistance-of-counsel claims de novo.  *Lado v. State*, 804 N.W.2d 248, 250 (Iowa 2011).  To establish an ineffective-assistance-of-counsel claim, the defendant must show that (1) counsel failed to perform an essential duty and (2) prejudice resulted.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Counsel is not ineffective for not raising a meritless claim. *State v. Halverson*, 857 N.W.2d 632, 635 (Iowa 2015).

"The adequacy of a jury-trial waiver is a mixed question of fact and law which we decide de novo."  *State v. Feregrino*, 756 N.W.2d 700, 703 (Iowa 2008).  Iowa Rule of Criminal Procedure 2.17(1) requires that a defendant waiving his right to jury trial must do so "voluntarily and intelligently" and such waiver must be obtained "in writing and on the record."  In *Feregrino*, our supreme court overruled prior case law and held there is no presumption that prejudice occurs when the court fails to comply with the requirements of rule

2.17(1). *See id.* at 707-09. In *State v. Keller*, the court held that even though the presumption of prejudice was eliminated by the *Feregrino* decision, counsel's failure to assure compliance with rule 2.17(1) established, as a matter of law, a breach of an essential duty by counsel. 760 N.W.2d 451, 453 (Iowa 2009). In those cases, the court preserved each defendant's ineffective assistance of counsel claims for postconviction relief for a determination of whether the defendant was prejudiced as a result. *Id.*; *Feregrino,* 756 N.W.2d at 708. In *Keller*, the court preserved the issue for postconviction relief because it determined the record was inadequate for review; there was no record of an oral colloquy or testimony from the defendant as to whether she would have waived jury trial had there been an oral colloquy. *Keller*, 760 N.W.2d at 453. The court found an evidentiary hearing was necessary. *Id.*

The State readily concedes the court did not obtain a written waiver from Hawkinson. However, the court conducted an on-the-record colloquy with Hawkinson in which he waived jury trial. Hawkinson claims that had he been provided with an opportunity to give a written waiver, he would have decided not to proceed and would have chosen to go to trial with a jury. Therefore, he contends the error resulted in prejudice to him. He argues, because his case is before this court on a direct appeal, there has been no opportunity for him to develop a record that he asserts would reflect he would have insisted on going to trial with a jury. Accordingly, he argues we should preserve the issue for postconviction relief. We agree with Hawkinson that there has been no opportunity for either party to establish an evidentiary record for Hawkinson's

claim that he was prejudiced by counsel's failure to ensure the court complied with rule 2.17(1). Accordingly, we preserve the issue for postconviction relief proceedings.

**B.     Admission of Conversation with Seibert.**

Hawkinson filed a motion in limine to exclude the conversation he had with Seibert about going back to prison and the statements she later made to law enforcement officers connecting his earlier statements and the crime. Hawkinson argued the conversation was irrelevant and unduly prejudicial because it disclosed the existence of his prior criminal history. Hawkinson did not seek to exclude the statements regarding the no-contact order between Hawkinson and his ex-wife and daughter or the fact that Hawkinson was on probation at the time of the crime. The State responded the conversation about going back to prison was relevant as direct evidence of Hawkinson's premeditation and to counter the provocation affirmative defense.

The court ruled,

> [O]rdinarily, the Court would be very cautious in the admission of evidence of the defendant's criminal history or the prior prison sentence.
> However, in this case it appears to the Court that the defendant's incriminating statement that he said he was or would be doing something that would cause him to be going back to prison, specifically in reference to perhaps two issues, but one of the issues was the ongoing conflict with one of the victims of the crime that occurred later that day, Mr. Hidic, the Court believes that the evidence is inextricably intertwined with the story of the crime. It's relevant to prove the defendant's state of mind, his intent, premeditation and deliberation.
> The evidence is prejudicial to the defense—the Court does not question that—but it is highly relevant and probative to material issues in this case. And the probative value is not substantially outweighed by the prejudicial effect to the defendant, especially

when, as the Court expects will be the case, the statement is put in context during the course of the testimony of Ms. Seibert and the officer that she told this to.

Following the court's ruling, defense counsel and the court had the following conversation:

> DEFENSE COUNSEL: And, Your Honor, in Paragraph 6 [of the motion in limine] we have concerns, first of all, with this long statement and conversation with Deb Seibert in her previous days of the homicide or the day of the homicide on May 17.
> Again—and this goes back to the issue about the statement about the prison—I know the Court has already ruled on that, but we have concerns about her elaborating on that the defendant was clearly upset with Sam Hidic and alluding to something that would send him back to prison, as we feel that—you know, as we made the record before that this is speculative, but if the Court is going to allow this, again, we're okay with during that course of the conversation about the fact that he was on probation, about the no-contact order. We are okay with that.
> THE COURT: Well, I think that I'll just allow you to object as you see necessary during the course of her testimony with regard to the scope of it and whether it's a narrative and whether it's cumulative and so forth, and I'll just rule as we go along. But generally I think you know what the parameters of the admissibility will be.

At trial, upon approaching Seibert's recounting of Hawkinson's statement that he was going back to prison, defense counsel objected based on hearsay. The court overruled the objection and Seibert testified as to the whole conversation. On appeal, Hawkinson contends the statements were inadmissible as evidence of prior bad acts and because, contrary to the court's ruling, they were not inextricably intertwined with the crime.

### 1. Error Preservation.

The State first contends Hawkinson failed to preserve error on his claims that the statements should not have been admitted. Hawkinson asserts he

preserved error through the motion in limine wherein he argued the conversation was irrelevant and would unduly prejudice him by disclosing his prior criminal history.

Generally, a motion in limine does not preserve error because the error does not occur until the matter is presented at trial. *State v. Harlow*, 325 N.W.2d 90, 91 (Iowa 1982). Therefore, usually, an objection at trial is required to preserve error. *Id.* There is an exception to this rule, and the objecting party need not renew its objections, if the ruling on the motion in limine "amounts to an unequivocal holding concerning the issue raised." *Id.* The State contends the court's ruling on the motion in limine did not constitute an unequivocal holding on the issue because the court also instructed defense counsel to object to Seibert's testimony as it was given and because the ruling was issued at a time when the parties believed the trial would be by jury.

The brief conversation the court had with defense counsel after its ruling referred to an issue separate from the prior claims of inadmissibility based on prior criminal offenses, relevancy, and undue prejudice. Counsel referenced paragraph 6 of the motion in limine, and objected to the statements Seibert made to law enforcement officers that Hawkinson, "was alluding to committing an act that would send him [b]ack to prison." Defense counsel's objections were to Seibert's statements to law enforcement officers in which she speculated that Hawkinson's statements referred to his intent to commit a crime against Hidic that would send him back to prison. Counsel continued to argue in limine to the admission of such testimony as being speculative. The court then encouraged

counsel to make further objections as he thought necessary during testimony. The court ended the discussion with "[b]ut generally I think you know what the parameters of the admissibility will be." We assume, without deciding, that the ruling upon whether Hawkinson's statements to Seibert were inadmissible for disclosing a prior criminal offense, irrelevancy, or undue prejudice was unequivocal. We address the merits based on that assumption.[3]

  2. <u>Merits.</u>

Generally, we review questions involving the admissibility of evidence for an abuse of discretion. *State v. Dudley*, 856 N.W.2d 668, 675 (Iowa 2014). An abuse of discretion occurs "[w]hen the district court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* A ground or reason is untenable if it is "based on an erroneous application of the law or not supported by substantial evidence." *Id.* Even if there has been an abuse of discretion, we need not reverse if the inclusion or exclusion was harmless to the defendant. *State v. Reynolds*, 765 N.W.2d 283, 288 (Iowa 2009).

Hawkinson complains the statements were inadmissible as evidence of prior bad acts under Iowa Rule of Evidence 5.404(b). Under rule 5.404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. *It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.*

---

[3] We also note that the ruling on the motion in limine was made when the parties contemplated a jury trial, not a bench trial.

(Emphasis added.) "Thus, such evidence is not admissible to demonstrate the defendant has a criminal disposition and was thus more likely to have committed the crime in question." *Reynolds*, 765 N.W.2d at 289. However, prior bad acts are admissible if they are offered for the purpose of establishing motive or intent. Iowa R. Evid. 5.404(b).

> Before evidence of prior bad acts can be considered admissible, the court must (1) find the evidence is relevant and material to a *legitimate* issue in the case other than a general propensity to commit wrongful acts, and (2) determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant.

*Reynolds*, 765 N.W.2d at 289-90. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Iowa R. Evid. 5.401. Although the conversation with Seibert discloses that Hawkinson has a criminal history involving some period of incarceration, it is also highly probative of Hawkinson's state of mind shortly before the murders occurred. Hawkinson was tearful, upset, and angry; the primary source of his frustrations was his boss, Hidic; he expressed frustration and anger at the way Hidic had treated him. These statements make it more likely that Hawkinson had motive and intent consistent with a first-degree murder, that is, a killing with malice aforethought with premeditation and deliberation.[4] Therefore, the conversation is relevant and material to a legitimate issue in the case, other than a general propensity toward criminal behavior. By showing

---

[4] See the elements of first-degree murder below.

Hawkinson had time to suppress the impulse to kill before acting, the evidence is also material to counter the defense that this was a heat-of-passion killing.[5]

We acknowledge this legitimate purpose for offering the evidence does not necessarily preclude the incidental effect of showing a propensity for criminal behavior. However, we conclude the effect of the inclusion of these statements was minimal because the defense did not object to the introduction of other evidence of Hawkinson's criminal record including the fact he was on parole and was subject to a no-contact order.

We must also determine whether the probative value of the evidence is outweighed by the danger of unfair prejudice to the defendant. "Unfair prejudice arises when the evidence would cause the jury to base its decision on something other than the proven facts and applicable law." *Reynolds*, 765 N.W.2d at 290. We consider the following factors:

> [T]he need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the prior bad acts, the strength and weakness of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*Id.* As discussed, the evidence is highly probative of Hawkinson's state of mind shortly before the murders occurred. Our supreme court has determined, "The prejudicial effect of other-crimes evidence is reduced in the context of a bench trial." *State v. Casady*, 491 N.W.2d 782, 786 (Iowa 1992). We have no reason to doubt that the court made the proper use of this evidence, as proof of Hawkinson's state of mind, rather than basing its decision on an inappropriate

---

[5] See the elements of voluntary manslaughter below.

factor. The probative value of the evidence heavily outweighed the risk of prejudice to the defendant in this case. "Clearly the likelihood of an improper use of the evidence is reduced [in a prior bad acts case] by the fact that the [] case was tried to the court." *State v. Taylor*, 689 N.W.2d 116, 130 (Iowa 2004).

The district court made both of the necessary findings: that the evidence was relevant and material to a legitimate issue in the case and that it was more probative than prejudicial. The court's conclusions to this effect, stated above, were consistent with the law and not based on reasons either untenable or unreasonable. There was no abuse of discretion.

### C. Sufficiency of the Evidence.

Hawkinson contends the evidence was insufficient to support convictions for murder in the first degree. We review sufficiency-of-the-evidence challenges for correction of errors at law. *State v. Randle*, 555 N.W.2d 666, 671 (Iowa 1996). We uphold a finding of guilt if the verdict is supported by substantial evidence. *State v. Henderson*, 696 N.W.2d 5, 7 (Iowa 2005). Evidence is substantial if a rational trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.* We consider all evidence in the case, including that which detracts from the verdict. *Id.* We view the evidence in the light most favorable to the State. *Id.*

In order to find Hawkinson guilty of murder in the first degree under Iowa Code sections 707.1 and .2, the State was required to prove each of the following elements:

> 1. On or about May 17, 2012, the defendant shot the victims, (Robert Smoot, Count I and Serif Hidic, Count II).

2.     The victims died as a result of being shot by the defendant.

3.     The defendant acted with malice aforethought.

4.     The defendant acted willfully, deliberately, premeditatedly and with a specific intent to kill the victims.

The court considered the following definitions taken from the Iowa Criminal Jury Instructions:

"Malice" is a state of mind which leads one to intentionally do a wrongful act to the injury of another or in disregard of the rights of another out of actual hatred, or with an evil or unlawful purpose.

"Malice aforethought" is a fixed purpose of designed to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time.

If a person has the opportunity to deliberate and uses a dangerous weapon against another resulting in death, you may, but are not required to infer that the weapon was used with malice, premeditation and specific intent to kill.

Malice may be inferred from the defendant's use of a dangerous weapon.

A firearm is, by law, a dangerous weapon.

To find Hawkinson guilty of voluntary manslaughter, the court had to find:

1.     On or about May 17, 2012, the defendant shot the victims, (Robert Smoot, Count I and Serif Hidic, Count II).

2.     The victims died as a result of being shot by the defendant.

3.     The act of the defendant was done solely by reason of a sudden, violent and irresistible passion resulting from serious provocation.

A "serious provocation" is conduct that would cause a reasonable person to have a sudden, violent and irresistible passion. Passion is not sudden, violent and irresistible if there is an interval of time during which a reasonable person would, under the circumstances, have time to reflect and bring his or her passion under control and suppress the impulse to kill.

Hawkinson contends the evidence does not support the convictions for first-degree murder because there was no evidence of premeditation or a fixed design or purpose to do harm before the act was committed. Rather, Hawkinson

asserts, the evidence supports a conclusion that the attack was done with little forethought and as a result of a sudden and irresistible urge due to provocation. The only dispute here is over the state of mind Hawkinson had at the time of the shootings.

Malice can be inferred here from the use of a gun. Other evidence in the record also supports a finding that Hawkinson acted with malice aforethought. Hawkinson had to obtain a gun, which no one else knew him to previously own. Upon leaving for Drina on May 17th, he told his parents he was going to get job applications with Dylan, but in fact he did not, as his phone records and subsequent conduct show. He dropped Dylan off in Winterset to proceed to Drina alone. This evidences a fixed plan and purpose to go to Drina alone that afternoon. Hawkinson had been at the Drina property earlier in the day talking with Seibert. He went to Drina at 5:00 p.m. when all the other employees had left for the day. He also expressed his purpose or design earlier to DeGregory, stating he would not give up his truck, "he would kill that motherfucker [Hidic] before he ever got that truck back." He turned the truck over the day before the shooting. On the day of the shooting, mere hours beforehand, he told Seibert he was upset with Hidic and would be going back to prison if his acts were "worth going back to prison for." Hawkinson shot both victims multiple times, first delivering non-fatal wounds. He had time between those shots to deliberate on his actions, even hearing Smoot beg him to stop. He chose to continue his shooting spree, subsequently shooting Hidic and Smoot additional times, delivering the fatal wounds.

The conflict between Hawkinson and Hidic was not of recent vintage. They had been in a financial dispute for over a year. They presumably had settled the dispute several weeks before the shooting. Hawkinson handed the truck over, pursuant to the settlement, the day before the shooting. He had time the morning of the shooting to talk with Seibert and discuss his feelings. He anticipated he would be going back to jail soon. This sequence of events, including the time that had passed since the lawsuit and the opportunities Hawkinson had to discuss and consider his conduct and plan his actions, does not include conduct by any actor that would cause a sudden, violent, or irresistible passion. If something more happened when Hawkinson encountered Hidic and Smoot at the Drina office to arouse a sudden, violent, and irresistible passion, no evidence of that was produced.

The record does not support Hawkinson's argument that we should find his actions were done solely by reason of a sudden passion resulting from provocation. From all the foregoing, we can conclude there was substantial evidence from which a rational trier of fact could find that Hawkinson acted willfully, deliberately, premeditatedly, and with specific intent to kill. Thus, we affirm the convictions.

## III.    CONCLUSION.

We preserve for postconviction relief Hawkinson's claim that his trial counsel was ineffective in failing to ensure the court complied with Iowa Rule of Criminal Procedure 2.17(1). The court did not abuse its discretion in admitting

Seibert's testimony. Substantial evidence supports the convictions for murder in the first degree. We affirm the convictions.

**AFFIRMED.**